HATTIE EDMONDS, Appellee, v. HARRY EDMONDS, Appellant.

**DIVORCE:** Physical Violence. Evidence held to justify a divorce on
1   the ground of cruelty in the form of physical violence.

**DIVORCE:** Alimony—One Fourth of Property. An award of one
2   fourth of the property of defendant, with additional monthly payments of $30, held proper, in view of the defendant's earning capacity.

*Appeal from Muscatine District Court.*—A. J. HOUSE, Judge.

NOVEMBER 15, 1921.

REHEARING DENIED FEBRUARY 17, 1922.

ACTION brought for divorce, on the grounds of cruel and inhuman treatment. Decree of divorce was granted plaintiff, and she was awarded alimony and the custody of an infant daughter. Defendant was awarded custody of their son. Defendant appeals.—*Affirmed.*

*J. F. Devitt,* for appellant.

*E. M. Warner* and *D. V. & R. S. Jackson,* for appellee.

ARTHUR, J.—Both plaintiff and defendant ascribe their troubles to their divergent religious faiths. He was a Roman

Catholic and she a Protestant, a member of the United Brethren

I. DIVORCE: physi-
cal violence.

church. From a careful examination of the record, we may agree with the parties that difference in their religious beliefs was the primary cause of their trouble, but not by any means the sole cause. Violent temper contributed to the more serious incidents of their married life which occurred during the last half year that they lived together, notably in April and in June, 1919, when they separated. Defendant claims that the separation was merely desertion by the plaintiff, without cause. Plaintiff says that she left the defendant because of his cruel and inhuman treatment of her. The serious trouble arose in April over defendant's wanting to take the little girl with him to his church, and plaintiff's not wanting him to do so. There was more trouble in June following, when the separation occurred, over the same matter, the father wanting to take the little girl to church with him, and the mother objecting.

From the testimony we gather that, just prior to their marriage, in 1907, plaintiff and defendant went to see the Reverend F. J. Leonard, a Catholic priest, concerning their intended marriage, and that Father Leonard performed the ceremony of their marriage soon afterwards. Father Leonard was a witness on the trial of the cause. He did not recall what was said about whether their offspring should be reared in the Catholic faith. He assumed that plaintiff had agreed that the children, if they bore any, should be brought up in the Catholic faith, because he would not have performed the marriage ceremony if that had not been the agreement. From the testimony of both defendant and plaintiff, we conclude that plaintiff did at least acquiesce in rearing their children in the Catholic faith. Plaintiff says, in argument, that she agreed only that the first child born should be raised a Catholic, and that her agreement extended no further. There were two children born to them: a son, Emerson, 12 years old at the time of the trial, and a daughter, Marian, 6 years old. Defendant insists that the agreement related to all children which might be born to them.

We are inclined to believe that the husband's version of the agreement is correct. Plaintiff, the wife, probably agreed that

her children should be reared in the Catholic faith, but with some mental reservation. There was no trouble over the boy. He attended the Catholic church and Sunday school, without any protest from the plaintiff. The serious trouble came when the husband undertook to make a Catholic out of the little girl, and take her to the Catholic church. Defendant's position is, as we understand him, that plaintiff breached her agreement to raise the children in the Catholic faith, and that he had a right to enforce the agreement at all hazards.

We are not concerned about specific performance of the agreement as to the religious training of the children. Our examination of the record has been for the purpose of ascertaining whether or not the defendant, in undertaking to enforce his desire and will to have the little girl attend the Catholic church, against the mother's desire and will, employed cruel and inhuman treatment. While plaintiff might be censurable for not living up to her agreement to have her children reared Catholics, and the primary cause of the trouble was traceable to her breach of the agreement, yet he would not be justified in visiting her with cruel and inhuman treatment; and if he did, in April, 1919, assault her, substantially as she claims, and treat her in the following June, when she left him, substantially as she alleges, she was entitled to a divorce.

The record shows quite a stormy married life. Counsel undertook to bring about a reconciliation, and brought the parties together for conversation, but it effected nothing. Defendant was asked by his counsel if there was any reason why they should not become reconciled if his wife would comply with her promise with regard to the faith in which the children should be raised, and his answer was:

"I don't think it would be possible, after all that has transpired in the last year and a half. I think that the feeling would exist that originally was before."

The record discloses considerable interference with plaintiff's control and discipline of her children, especially of the son, by defendant's mother and by his sister, who was a maiden lady of some 50 years; and that, when trouble arose, defendant was inclined to side with his people, rather than with his wife. Pleasant feeling did not all the time exist between plaintiff

and her sister-in-law, Miss Anna Edmonds. Miss Edmonds was asked if she and plaintiff did not have, on a certain occasion, "a fist fight," and she answered:

"No, we never had a fist fight; she made a grab at my hair, and when she grabbed, I grabbed ahold of her hair, and I held on; but we never came to blows."

The most prominent and regrettable events occurred, the first one in April, and the last one in June, 1919, which culminated in a separation, which the husband designates as desertion, without good cause; and the plaintiff says that she left because of his cruel and inhuman treatment of her. As to the tragedy in April, plaintiff testified that, on April 13th (Sunday), her husband wanted to take the little girl to the Catholic church, and she objected, and that made him mad, and some harsh words passed between them, and he cursed and swore he would take her to church; that she took the little girl in her arms and ran over to a neighbor's, Mrs. Meeker; that Mrs. Meeker's screen door was hooked, so that she did not get into the house right away; that, by the time Mrs. Meeker unhooked the door, her husband arrived. She says he was mad, and "white as a sheet;" that he grabbed Marian, the little girl, whom she was holding in her arms, and she held onto the child, and he pulled on the child, and they backed over into their own yard, when he grabbed her by the throat, and said, "Damn you, I will choke you if you don't let loose of her;" that his mother happened to be standing near by, and called to her son, asking what was the matter; and that he said to his mother, "Hattie here is raising a big commotion because I want to take Marian to church, and she objects to my doing so;" and he choked her so hard that he got the baby away from her; that he took the child to the Catholic church; that, after that, there was nothing more said about taking the little girl to church until the 15th of June; that then he said, "Get Marian ready and I will take her to church; there is communion at our church, and she can see the little children marching."

"I said, 'No, she cannot go.' He then swore at me, and said 'You and I are just about to finish.' I said, 'All right, if you feel that way about it. I know one thing; I can't live like this, always expecting you to be jumping onto me about something.'

He said, 'I will give you to understand right now, if I have to support you and support these two children, I am going to have them brought up the way I want them. You can go; there is the front door; pack up your things and go; I am done.' I said, 'I can go; if you don't want me here, I can go.' I left, and have lived since then with my father. When I was married, my health was good, except I was nervous. In June, 1919, when I left him, I was all run down. If I had lived with my husband much longer, I think I would not be here to tell the tale. I was under medical treatment at the time I left him, and have been since. My health is a great deal better at this time.''

Concerning the trouble on Sunday morning, April 13th, defendant says:

'' 'Well, aren't you going to let Marian go to church?' She said, 'No, she isn't going.' I said, 'That is strange; I promised her that she could go,—it is no more than right she should go.' Nothing more was said just then, and I went upstairs for something, and when I came down, my wife and Marian were gone, and it dawned on me that she had taken her out in order to keep her from going to church with me. I was angry then. I rushed out the back door, and saw her trying to get in at Meeker's, next door. The screen door was hooked, and she could not get in. Then I rushed over there, and I grabbed Marian, and she held onto her until we got over in our yard. I was backing up all the time. When I got in our yard, I said, 'I am going to take Marian to church this day, if I never take her again;' and then I put my hand up against her breast and shoved her away, and took Marian away from her. I dragged them both back from Meeker's. About that time, I didn't give a God damn what happened.''

He testified to the final trouble in June:

"I asked her if I couldn't take Marian to church. She said, 'No, I will give you to understand that Marian is not going to be raised a Catholic, the same as Emerson was; and anyway, there is a children's day at the U. B. church, and I am going to take Marian and go over to the U. B. church.' I then said, 'It seems mighty strange, as long as I have to support you and support the children, that I haven't got a voice in the way the children are to be raised;' and she said, 'I will leave you and

get a divorce;' and I said, 'That doesn't make any difference to me; if you want to leave, that is up to you; but, before you leave, you want to think it over well.' "

Defendant admitted swearing around home, but said he never swore at his wife directly.

Mrs. Meeker testified about the affray at her door in April: "When I got to the door, she had the little girl in her arms; and when Mr. Edmonds came up, they pulled at her [the child], and he got her. He told her to get away or he would choke her, and he swore at her. He said to her, 'Get away, or I will choke you.' He grabbed the child, and pushed his wife away and pressed her back."

Ima Goodwin, who was at Mrs. Meeker's and saw what occurred, testified: "After Mr. Edmonds arrived, he grabbed the little girl, and said, 'Damn you, leave go of that child,' and said he would choke her if she didn't. He pressed his hand against her throat, and told her if she didn't let loose of the child, he would choke her, and he pushed her away from him. I wasn't close enough to say whether he tightened his grip on her throat." .

Elizabeth Edmonds, defendant's mother, and Miss Anna Edmonds, his sister, testified to plaintiff's punishing her children too severely, in their judgment. The little boy, Emerson, 12 years old, testified that one time his mother hurled a ruler about half an inch thick at him, and hit him above the right eye, which made a bad cut; and that he told his grandmother about it.

Defendant also said that his wife would not reprimand the children when they needed it; and that, when she whipped them, it was very severe; that her punishment of the children was not in proportion to their need of it, but depended upon her temper. Defendant insisted that his mother and sister never interfered, except when his wife was punishing the children too severely; and both his mother and sister so testified.

Both parties were possessed of more temper than patience and forbearance. Plaintiff's version of the affair beginning at the Meeker door is strongly corroborated by Mrs. Meeker and Ima Goodwin, whom we may assume to be disinterested witnesses. We think the testimony establishes by a fair preponder-

ance the charges of cruel and inhuman treatment and the effect, substantially as claimed by plaintiff.

The custody of the son was awarded to defendant, and the custody of the daughter to plaintiff. The homestead property, all they possessed, was valued at $2,500 by defendant: Defendant was earning $20 a week. Alimony in the

2. DIVORCE: alimony: one fourth of property.

amount of $600 was awarded plaintiff, to be paid on or before five years, and was made a lien on the property, and it was ordered that defendant further pay to plaintiff, monthly, $30 for her support and the support of the daughter, Marian, until Marian arrives at the age of 18; that, in the event of the remarriage of plaintiff before the daughter attains the age of 18, the amount of the monthly payment shall be reduced to $15 a month. In addition, an attorney fee of $25 was allowed plaintiff's attorneys.

We find no reason to disturb these orders. The decree and orders of the lower court are affirmed.—*Affirmed.*

EVANS, C. J., STEVENS and FAVILLE, JJ., concur.